# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>ERICK LADAL SIMS,<br><br>Appellant. | No. 83376-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — Erick Sims appeals a criminal conviction after a bench trial. Sims asserts the evidence supporting his conviction for assault is not constitutionally sufficient, and his conviction for assault is inconsistent with his acquittal of rape. Finding no error, we affirm.

I

The State charged Erick Sims with rape in the second degree and murder in the second degree of Devan Schmidt. Following a bench trial, the court acquitted Sims of rape and murder, but convicted him of the lesser included offence of second degree assault. Among other arguments, Sims challenges whether the evidence was sufficient to convict him of assault.

Trial evidence showed that in the early hours of May 2, 2015, Schmidt invited Dominique Dixon and Kevin Turner to her home. Dixon and Turner asked Sims for a ride. Schmidt did not know Sims. The three arrived at approximately 3 a.m. After some time, Schmidt and Sims left. When they returned, Schmidt's hair

was wet, and she said they had jumped into Lake Washington. Dixon testified she did not see any injuries on Schmidt. At approximately 6:00 a.m., one of Schmidt's roommates observed Schmidt to be uninjured.

The guests departed shortly before 7:00 a.m. Schmidt texted Dixon at 6:53 a.m., "Woman! I couldn't get u alone but why were you trying to hook me up with your drug dealer? Lol trust me I have enough on my plate already." Schmidt tried to call her boyfriend several times between 6:54 a.m. and 6:58 a.m. At 6:59 a.m., Sims texted Schmidt, "Hello." At 7:00 a.m., Sims texted Schmidt posing a request Sims testified was for drugs but a police officer testified referred to things of a sexual nature. Schmidt texted Turner, "Your boy is here what's the best way to get rid of him?" Turner responded, "Tell him ur going to sleep have a good night," "And you have a bf and u don't wanna fuck it up," and, "Do u need us to come back." At 7:18 a.m., Turner and Dixon spoke with Schmidt on the phone. During that conversation, Schmidt said, "[I]t's okay. I'm a big girl. I can handle myself."

Sims's cell phone records show he remained near Schmidt's home from 5:05 a.m. to at least 8:14 a.m. At 8:39 a.m., Sims's phone connected to a cell tower approximately six blocks to the north of the one it connected to while at Schmidt's home. Sims consistently admitted he returned after initially departing, but provided inconsistent accounts of his actions upon returning. At trial, Sims claimed that when he initially departed he drove two or three blocks, then returned to Schmidt's house to ask her about her cocaine connection. Sims claimed he knocked on the door, waited a few minutes, tapped on the window of her room,

2

then returned to his truck to text and call Schmidt. Sims testified he waited in his car while he smoked a cigarette, and then got lost and drove in circles in Schmidt's neighborhood, near her home, for 15-20 minutes. The trial court found Sims's testimony that he got lost trying to leave the neighborhood was not credible.

At approximately 10:50 a.m., a roommate found Schmidt deceased. Brian Mazrim, MD estimated Schmidt's time of death at roughly 9:00 a.m., "give or take a couple hours." Based on the lividity on Schmidt's body and the stiffness of her jaw described by responding fire fighters, Schmidt had been dead for "at least half an hour, maybe an hour before the medics arrived."

Dr. Mazrim observed several injuries to Schmidt's body: a one inch diameter bruise to the left temple area which occurred within a day or two of death, two small abrasions to the face, an acute bruise on the inner aspect of the lower lip, which "would be up against her lower teeth," acute bruises over both hip bones caused by pressure strongly applied to those areas externally from a blunt object, a bruise over the pubic bone, acute bruises to both knees, acute bruises from blunt force injuries to the tops of both feet consistent with an individual prone on the floor, scrapes and bruises to the tops of the toes, a small cut on the right pinkie from within about an hour of death, and "Deep down in the neck at the top of what would be the Adam's apple or the voice box there was an area of acute hemorrhage." The last injury "can be seen when there is an external force applied to the neck. Typically a hand because . . . the fingers . . . reach in deep."

The injuries to Schmidt's face were caused by "something to the effect of a hand over the mouth and nose . . . [o]r perhaps the face pressed into the floor or some other material." The bruising to Schmidt's hips, knees, and the tops of both feet suggest they were sustained while lying face down on a hard surface. Dr. Mazrim deemed the cause of death undetermined after identifying as possible causes intoxication and asphyxia.

Swabs were collected from Schmidt's body and sent to the Washington State Patrol crime lab. Amylase, which is an enzyme usually associated with saliva, was found on swabs from Schmidt's neck, right wrist, left wrist, and vaginal area. Deoxyribonucleic acid (DNA) profiles from the neck, right fingernails, and right wrist were consistent with the combined profile from Schmidt and Sims.

When reviewing the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. State v. Green, 94 Wn.2d 216, 220, 616 P.2d 628 (1980). Relevant here, "[a] person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree . . . [i]ntentionally assaults another and thereby recklessly inflicts substantial bodily harm." RCW 9A.36.021(1)(a). Washington recognizes an unlawful touching as assault. State v. Elmi, 166 Wn.2d 209, 215, 207 P.3d 439 (2009). "Whether sufficient evidence supports finding a defendant acted recklessly 'depends on both what the defendant knew and how a reasonable person would have acted knowing these facts.' " State v. Melland, 9

4

Wn. App. 2d 786, 804, 452 P.3d 562 (2019) (internal quotation marks omitted) (quoting State v. Graham, 153 Wn.2d 400, 408, 103 P.3d 1238 (2005)). The trier of fact is "permitted to find actual subjective knowledge if there is sufficient information which would lead a reasonable person to believe that a fact exists." State v. Johnson, 119 Wn.2d 167, 174, 829 P.2d 1082 (1992) (emphasis omitted).

The evidence allowed a rational trier of fact to conclude Sims was present in Schmidt's home after others left, and that he had unlawful physical contact with Schmidt. This includes Sims's admission that he returned, text messages from Schmidt's phone, Sims's cell phone records placing him in the vicinity of Schmidt's home, and the presence of Sims's DNA on Schmidt's body. In addition, the last people to see Schmidt alive, other than Sims, did not observe any injuries on Schmidt.

The evidence also allowed a rational trier of fact to find Sims acted recklessly. Dr. Mazrim described the injuries to Schmidt's face as consistent with a hand being held over her mouth and nose. Dr. Mazrim described the acute hemorrhaging in Schmidt's neck as consistent with external force being applied to her neck. Dr. Mazrim described the constellation of bruises to Schmidt's hips, knees, and feet as consistent with her being held to the ground with some force. A rational trier of fact could conclude that these actions will cause injury and are a gross deviation from conduct that a reasonable person would exercise in the same situation.

5

A rational trier of fact could find the injuries described by Dr. Mazrim constitute substantial bodily harm. Bruising can be sufficient to establish substantial bodily harm. State v. Hovig, 149 Wn. App. 1, 13, 202 P.3d 318 (2009) (substantial bodily harm found due to injury from a bite when pain would have been experienced at the time of injury, and bruising would have lasted from 7 to 14 days); State v. Ashcraft, 71 Wn. App 444, 455, 859 P.2d 60 (1993) (substantial disfigurement found when bruise marks were consistent with being hit with a shoe); State v. McKague, 172 Wn.2d 802, 806, 262 P.3d 1225 (2011) (substantial bodily harm when assault resulted in facial bruising and swelling lasting several days with lacerations to face, back of head, and arm). Schmidt's injuries included bruises and contusions consistent with Schmidt having been held down. There was sufficient evidence of second degree assault.

II

Sims argues the court reached inconsistent conclusions by acquitting him of rape but convicting him of assault. Generally, Sims argues the court's conclusions are inconsistent because, he says, the same circumstances leading to reasonable doubt about rape logically also lead to reasonable doubt about assault. We disagree.[1]

---

[1] We do not understand Sims to assert that there is an inconsistency between the court's acquittal of murder and conviction for assault. Such a claim could not stand. The court acquitted of murder because it found reasonable doubt existed as to whether Schmidt's injuries caused her death. This does nothing to insulate anyone from criminal liability for causing Schmidt's injuries.

Sims argues the court recognized an alternate basis for explaining certain DNA results when finding reasonable doubt as to rape, but then neglected to acknowledge the same doubt about assault. Sims's DNA was found on Schmidt's body coinciding in certain locations with amylase, an enzyme associated with saliva. The court explained, "The State asks the Court to conclude that the presence of Am[y]lase on portions of Ms. Schmidt's body where Mr. Sims' DNA was also found is evidence that the DNA was contained in Mr. Sims' saliva." But the court continued, "This is not the only reasonable inference from this evidence. The uncontroverted testimony presented at trial, from several experts, was that Am[y]lase is an enzyme found in the human digestive system, including in saliva." There was evidence that Schmidt had vomited, which could explain the presence of amylase. Likewise, the court noted, "if Ms. Schmidt and Mr. Sims shared cocaine [by taking 'bumps' off each others' hands], especially once he returned to her house, this would provide an alternate explanation for Am[y]lase on her hands and wrist." But the court went no further than to say the evidence was inconclusive about whether Sims's saliva was the source of the amylase found on Schmidt's body, which tended to undermine the State's theory of rape. Contrary to Sims's implication, doubt about whether Sims's saliva was the source of these particular DNA findings does not mandate a finding of reasonable doubt that Sims could have assaulted Schmidt.

Sims argues the court found the absence of certain injuries supportive of reasonable doubt about rape, and he says this compels a like conclusion about

7

assault. This discussion begins with DNA results that, unlike those discussed above, were not inconclusive. Sims's DNA was "under Ms. Schmidt's fingernails and on her wrist," as well as "on Ms. Schmidt's neck." The court did not view these findings as proving assault by themselves, but found they were "consistent" with Sims holding Schmidt down, restraining her by the neck, and Schmidt fighting defensively. The court further relied on Dr. Mazrim's testimony that established "Ms. Schmidt's injuries were consistent with the perpetrator holding Ms. Schmidt face-down on the floor with enough strongly applied force to cause bruising along the surfaces of her body that contacted the floor." But the court doubted that Sims inflicted these injuries while committing a sexual assault, stating that if he had done so he may have inflicted greater injury to other parts of Schmidt's body: "Ms. Schmidt had no discernible injuries to the back side of her body. If a perpetrator was holding her down while thrusting or attempting to thrust into her, one might expect to see abrasions or other injuries to her back, buttocks or legs. Again, while the absence of this evidence is not dispositive, it is relevant."

There is no inconsistency. The court viewed the evidence as indicating Sims forcibly restrained Schmidt against the floor. That there were potentially innocent explanations of Sims's DNA being found on Schmidt's neck and wrist does not mandate doubt that he forcibly restrained her. The court did not point to any DNA findings as conclusive, but described them only as "consistent" with an assault evidenced independently by other circumstances. The DNA findings were probative, because they did not rule out an assault causing injuries like those that

8

were found, and because they could reasonably be caused by such an assault. Similarly, the court's view that Sims might have caused additional trauma if he had inflicted Schmidt's injuries during a sexual assault is not inconsistent with a conclusion he caused those injuries independent of a sexual assault. And, as described above, there was sufficient evidence supporting the conclusion that Sims caused Schmidt's injuries.

Because the court's conclusions are not inconsistent, it is not necessary to analyze the level of scrutiny Washington would apply to inconsistent conclusions following a bench trial in a criminal case.

Affirmed.

_Birk, J._

WE CONCUR:

_Feldman, J._            _Mann, J._